## Case No. 10,331.

### The NORTH STAR.

### VANDERBILT v. REYNOLDS et al.

[8 Blatchf. 209] [1]

Circuit Court, S. D. New York. Feb. 6, 1871.[2]

COLLISION — APPROACHING STEAMERS — PORTING HELM—PROPERLY SCREENED SIDE LIGHTS— DIVISION OF DAMAGES.

1. Two steamers, A. and B., were approaching each other, at night, so nearly end on as to involve danger of collision, and A., instead of porting her helm, starboarded it, and a collision ensued; *Held*, that she was in fault.

2. She was also in fault in not seeing the lights of B., and in not slowing, stopping and backing when the danger of collision was manifest.

3. B. was in fault in not having her side-lights properly screened, which tended to mislead A. in regard to the course of B., and prevented an

early discovery by A. of her own mistake in the movement she made.
[Applied in The Santiago de Cuba, Case No. 12,333.]

4. Both vessels being in fault, the loss was divided.
[See The Albemarle, Case No. 135.]

[Appeal from the district court of the United States for the Southern district of New York.]

[These were libels by William H. Reynolds and others, owners of the Ella Warley, against Cornelius Vanderbilt, claimants of the North Star, and Cornelius Vanderbilt against William H. Reynolds and others. From a decree of the district court holding the Ella Warley in fault (case unreported), an appeal was taken to this court.]

Edwin W. Stoughton and Erastus C. Benedict, for the Ella Warley.

Charles Donohue and William A. Beach, for the North Star.

WOODRUFF, Circuit Judge. The libellants in the first named cause are the owners of the steamship Ella Warley, and the libellant in the second cause is the owner of the steamship North Star. Each seeks to recover damages caused by a collision between these two steamships, at about a quarter before nine o'clock in the evening of February 9th, 1863. This collision occurred at sea, off the coast of New Jersey, opposite, or a little below, Long Branch, at a distance from the shore in respect to which witnesses and parties differ. No testimony in the case tends to show that it was less than five miles, and none warrants the belief that it was more than seven and one-eighth miles. In a smooth sea, a night not very dark and the wind light, with full opportunity to each to see and watch the lights of the other, and when, in fact, according to the testimony of those who were upon the respective vessels, each was seen at such distance from the other as would furnish ample opportunity for any manoeuvre called for by the exigency, the two collided, and the Ella Warley was sunk, with her cargo, and some lives were lost.

That a collision occurring under such circumstances was the result of mismanagement, and was due either to carelessness or incompetency, is indisputable. The Ella Warley was on a voyage from New York to New Orleans, and the North Star on a voyage from Key West to New York. The testimony of the witnesses called and examined by the respective parties tends to irreconcilable conflict; and any endeavor to harmonize the testimony on either side with that on the other, and with the conceded or uncontroverted facts, would be utterly fruitless. It cannot be done. The counsel for the owners of the Ella Warley, arguing from the testimony on their behalf, present a very strong case, while the counsel for the owner of the North Star, arguing from the

---

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
2 [Affirmed in 106 U. S. 17, 1 Sup. Ct. 41.]

testimony of those on board that vessel, with great force cast the blame upon the former. On each side, it is necessary to impeach the truth of the testimony on the other. I shall content myself with stating my conclusions from all the evidence, without criticizing the witnesses or their testimony in detail, and without professing to make an argument to support the convictions which, after much time spent in studying and comparing the evidence on both sides, rest upon my mind.

In such a case, the witnesses who are concerned in the management of the respective vessels, conscious that the serious consequences which ensued must be imputed to the fault of some of them, and feeling the heavy responsibility under which they acted, have a very strong motive to represent their conduct most favorably to themselves; and it is not doubtful, I think, here, that, in some particulars, that feeling has either led to untruth or has made the memory inaccurate. To whom, in particular, this is, in my judgment, most applicable, I shall leave to be inferred from my conclusions.

It is first to be observed, that the general course of the two voyages was precisely opposite, the Ella Warley going from the port of New York down the Atlantic coast, and the North Star coming up the coast, bound for the port of New York. The course of each was over the track of a large coastwise commerce, where inward bound and outward bound vessels were to be expected, and where, for that reason, great watchfulness and diligence were demanded from both. There is testimony tending to show that it was usual for vessels bound down the coast to take an outside track or course and for inbound vessels to keep somewhat nearer the shore; but the proof on this subject is not such as to show that there was any such rule of navigation as would make it, per se, a fault in either vessel to choose her course as her master, in his discretion, might see fit, whether nearer or more remote from the land.

The general rule of navigation is not disputed, that, when two steamers are meeting each other on courses directly opposite, or on courses so nearly opposite as to involve danger of collision, it is the duty of each to port the helm and pass the port side of the other. The general course of the vessels in question would suggest that they were meeting, within the proper construction of that rule. As the Ella Warley, after she saw the North Star, starboarded her helm and attempted to pass the starboard side of the North Star, the effort on her behalf is to show that her position and her observations upon the position and course of the latter vessel were such as to withdraw her from the obligation of this rule and justify what she did.

The testimony, I think, shows, that the North Star, at six o'clock in the evening,

was off Barnegat, and five or six miles from the shore. Her master first states, in his testimony, five miles, and afterwards six miles. From that place, her course was taken "north by east half east, magnetic true course, north-east," and that course was maintained until she saw the lights of the Ella Warley, the intent being to steer on a direct course for the light-ship, about seven miles off Sandy Hook. The Ella Warley left port in charge of a Sandy Hook pilot, in the afternoon, and proceeded down the bay. When, according to the testimony of her second officer, outside the outer bay, abreast of the Highlands, or, according to the testimony of the pilot himself, about a length inside the bar, the pilot left her. He instructed the master to keep her on a south-east course for a quarter or half an hour, and that would carry her near the light-ship, outside of all vessels bound in, and then he could shape his course as he pleased, or, as the master states the instructions: "Keep her south-east, and it will clear you of everything. It will take you outside of the light-ship." Taking the testimony of the witnesses from the Ella Warley for the present to be correct, she did proceed out on a south-east course, to and a little beyond the light-ship, and, at eight o'clock, took her course south half west, and afterwards changed to south, very shortly after which the light of the North Star was reported. If these courses be assumed, it is true that the two vesssels were not approaching each other on precisely the same line, but on two lines which converged to a point at or near the light-ship, and varying only one point from each other; and it is clear, I think, that, as they approached each other, if there seemed any doubt of their passing in safety, they were within the rule above stated, and each should have ported the helm and passed to the right. For, be it observed, that, in the night, if there be no other decisive indication than the approach of lights in the direction stated, neither vessel is likely to know the precise point to which the courses converge, and the rule stated is the rule of safety, if any change is made. Was there, in the present case, any other indication of the position and course of these vessels, and, if so, what manoeuvre on the part of either or both did it teach? The manoeuvre actually made by each resulted in the collision. That is to say, the North Star, after she saw the Ella Warley, ported, conforming, in that respect, to the rule, and went more to the eastward. The Ella Warley, departing from the rule, starboarded when she saw the North Star, and went also to the eastward, and the collision followed.

It is perfectly certain that the above courses of the two vessels and their relative position are not precisely accurate, if the witnesses who were on the North Star, and testify to seeing the light of the Ella Warley

before the North Star ported, are to be believed, for, they are distinct and unqualified in their statement, that, when they first discovered her, she bore a little over the port bow of the North Star. If she was to the eastward of the light-ship, and the North Star was on a direct course to that ship, she would be seen a little on the starboard bow; and it follows, that the course of the North Star was a little more to the east at that time, or the testimony from the Ella Warley is erroneous in the representation that she was to the eastwardly of the light-ship. But it is to be here observed, that the difference is not great. The witnesses do not assign to her bearing more than a slight variation from directly ahead. Those who are called on behalf of the Ella Warley, from the North Star, concur with those called by the latter, in saying that the former was seen from the North Star, right ahead, or a little on, the port bow, or, as one expresses it, "as near ahead as you could make it." Considering the general conformity of the line of the two courses, a very small allowance from precise accuracy, of course, in either of the two vessels, would harmonize with this evidence. This, again, confirms the circumstances before mentioned, showing the applicability of the rule referred to, to vessels in such relative positions.

On the other hand, three witnesses on the Ella Warley are equally positive, that, when the North Star was first seen from the former vessel, she was seen over the starboard bow. If that was before either changed the courses above first stated, that testimony is not irreconcilable with the testimony from the North Star. If a vessel on a course northeast sees another vessel over her port bow, such other vessel, being on a course south or south half west, may see the first over her own starboard bow, if she be, at the time of observation, to the eastward of a line due north, or north half east, from the first named vessel. This, however, involves the condition which is denied by the owners of the Ella Warley, namely, that she was to the westwardly of the course of the North Star. It is, nevertheless, very important, because it reduces the points of contradiction between the witnesses. It was argued with earnestness, that the numerous witnesses from the North Star, including those called by the Ella Warley in her own behalf, who testify that the latter was first seen over the port bow of the former, must be mistaken, because the North Star was seen over the starboard bow of the Ella Warley. There is no necessary inconsistency, as will readily be seen by drawing the lines above suggested. On the contrary, if, at the moment of observation, the Ella Warley was not to the eastward of the course of the North Star, and was to the eastward of a line drawn from the latter in the direction which corresponds with the Ella Warley's course reversed, then the North Star must have been seen over the

starboard bow of the Ella Warley, and the Ella Warley must have been seen over the port bow of the North Star. To my mind, the weight of the evidence is preponderating, that this was the actual relative position and course of the two vessels, when each was first seen by the other, which was at or very nearly the same time. It makes the witnesses on both sides not only harmonize but corroborate each other.

This, however, leaves unexplained the testimony tending to show that the Ella Warley had passed beyond the light-ship, and had not drawn any more near to the shore afterward, for that testimony tends to show that, when seen from the North Star, she was to the eastward of the course of the North Star. That testimony is not sufficient to overcome the large preponderance of the evidence that she was in fact seen over the port bow of the North Star, or very nearly or quite ahead, which latter goes still further to harmonize all the witnesses. Indeed, one of the witnesses thought, that, for a moment, the Ella Warley seemed a little to the starboard of that bow, though but for a moment, which might readily happen if she was very nearly ahead and any unsteadiness attended the motion of either. If I were to attempt an explanation, I should say, that the proofs above adverted to reduce the inquiry to two questions: Did the Ella Warley pass beyond the light-ship, and preserve such a course thereafter, that, when first seen from the North Star, she still was to the eastward of the course of the North Star, above stated? or, on the other hand, had the North Star, before she saw the Ella Warley, so fallen off to the eastward, that the line of her course would pass to the eastward of the latter? If the latter question be answered affirmatively, then the explanation is made, and the North Star would see the Ella Warley on her port bow, while the latter must see the North Star on her own starboard bow. No witness, however, testifies that the North Star did so fall off, and the suggestion is not to be made, unless as a possible explanation in the midst of conflicting testimony not otherwise to be harmonized. To answer the former question in the negative requires the assumption that the master and mate and look-out of the Ella Warley have testified untruthfully, or that, in the night, they did not judge correctly of their actual position and course, or, from some cause, were rendered temporarily incompetent to determine with exact precision their position and subsequent course. If I were driven to that, I must say, as I have already said, that the proofs satisfy me that the Ella Warley was first seen very nearly ahead, but a little on the port bow of the North Star, and the doubt created by the testimony of the master, look-out and mate of the Ella Warley is not sufficient to overcome those proofs.

I concur with the learned judge of the district court, that the testimony of the mate of

the Ella Warley, who navigated her at and before the collision, and who made the erroneous manoeuvre, if any was made, is not satisfactory. Whether the collision occurred five or seven and one-eighth miles from the shore, neither he nor his look-out made any proper observation of the lights of the North Star. In the first place, it is very clearly shown, that, when the vessels respectively sighted each other, they were not less than eight miles distant, and, judging by the combined speed of the two, (from 18 to 20 miles an hour,) and the interval which elapsed, thirty-five minutes, I think the distance not less than ten. Now, the witnesses from the Ella Warley would have the court believe that they saw the light of the North Star, and watched it, down to the time of the collision, and that the light they saw was a green light. True, Prendergast says he did not at first discover what color it was, but he watched it, and, in a few minutes, it proved to be green. Now, it is, I think, certain, that he could not see a green light at all at that distance. If not, then he saw the white light; and two necessary inferences flow therefrom—first, the charge that the white light of the North Star was so placed as not to be visible, fails, and Prendergast and his men were wholly remiss in not seeing both lights during nearly all the time of their observation; and, second, if they are at all to be credited, or, if, in fact, the North Star went to starboard, as she certainly did, not the white only but the red light of the North Star came fully into view, and yet they represent that they saw neither until the instant before the collision. Whether this is because there was no proper look-out, or because, under the pressure of the motive to justify the movements of the Ella Warley, Prendergast does not tell the whole truth, the failure to see, or the statement that he did not see, the lights of the North Star, which must have been visible, warrants great distrust of his vigilance or of his veracity.

Another circumstance has great significance, in its bearing upon the question whether Prendergast, in navigating the Ella Warley, exercised proper care, and is especially important in view of the rule invoked for his justification, to wit, that, when he saw a green light over his starboard bow, the rule requiring him to port his helm does not apply, but, on the contrary, it was his duty to starboard and pass under the stern of the vessel so seen. At ten minutes past eight, thirty-five minutes before the collision, when the North Star was from eight to ten miles distant, he changed his course to starboard, as he distinctly swears, for "fear of a collision." Now, in the first place, he could not have seen a green light at so great a distance, and he did not, therefore, act upon the assumption which makes the rule invoked applicable, namely, that he saw a vessel that was headed to the westward of his course. Next, he made a change

for fear of a collision, at a time when, according to his own testimony as to the time, he could not determine the course of the vessel he proposed to avoid. And, further, and what seems to me of great importance, he thus admits that he saw the North Star at ten minutes past eight, in such a position, in fact, that there was, in his judgment, danger of collision. He makes for himself, in very decided terms, the very case to which the rule first herein referred to applies, namely, two vessels approaching each other from opposite courses, so as to involve danger of collision, when each should port the helm, at the very time, when, making his observation, he was impressed with the danger, and changed his course from fear, and changed it in the direction forbidden by the rule. That he afterwards saw the green light would be the effect of his change, when the vessel came nearer; and I think it most probable, that the bringing of that light into view, by reason of the change and the want of attention to the North Star afterwards, has led him and the other two witnesses from the Ella Warley to the belief, that the North Star was to the westward of the Ella Warley from the beginning.

The observations above made, the conflict of testimony in the case touching the precise position and bearing of the two vessels when they respectively sighted each other, and the difficulty of judging, upon each vessel, when necessarily ignorant of the precise situation and course of the other, and of the view presented to the eye there, if an unregulated discretion was to determine the movements of each, all suggest the reason for the rule first above stated, and illustrate the importance of carefully observing it. It is just such conflict of testimony, complication of manoeuvres, and danger of an error in supposed discretion, that the rule guards against, and that its framers contemplated. It is easy of observance and perfectly safe.

But, the mismanagement on board of the Ella Warley was not confined to the violation of the rule referred to. When the danger of collision became imminent, her officer knew it, or he was so careless in his observations as not to see what became obvious. His failure to see the red or white lights of the North Star countenances the last alternative. He ran his vessel at full speed to the destruction which was impending. He should have slowed his engine, stopped and backed. Even fault on the part of the North Star did not relieve him from that duty. The witnesses from the Ella Warley represent, that, to them, the North Star appeared to be following them up, as they changed their course more and more to port; and Prendergast represents that he was in continual fear of collision, from the time he sighted the North Star. If he tells the truth, he should have stopped when he had time to do so. At all events he should, even at the latest moment, have done what he

could to avert the blow or lessen its force, but he did absolutely nothing. On the other hand, the North Star ported and ran to starboard in obedience to the rule, and, when the danger became imminent, slowed, stopped, and backed, as was her duty to do. My conviction of the fault of the Ella Warley is very decided.

If the North Star was without fault contributing to the collision, the decree of the district court was right and should be made the decree of this court. But, the lights of the North Star were not properly screened. They were grossly in violation of the rule. The board which should have projected forward several feet and hidden the green light from view across the bow, was, at the top, not more than two inches forward of the light. It is palpable, that, for this reason, the projecting bull's eye threw the light in such direction that it could be seen from two to four points over the port bow of the vessel, when it should only be visible from ahead or from starboard. Indeed, the master of the North Star seems to have been fully aware of this, and to have become so accustomed to the fact. as to have concluded, that it is proper to carry the green light so screened that it may, nevertheless, be seen from four points off the port side. At five points, he thinks, it ought not to be visible. This fault in the screens I regard as wholly inexcusable, and the allegation that the vessel passed inspection does not justify it.

It was suggested, that, because the lantern itself was opaque on two sides, therefore, screens were not necessary. All that need be said of that is, that the screens are intended to project forward on the line of the keel, for the purpose of shutting the light from an oblique view over the port bow, and the back of the lantern could serve no such purpose. It would be nothing more than a screen which did not project at all beyond the light.

Now, although it is clear that those on board the Ella Warley did not use proper vigilance in observing the lights of the North Star, and did not, as they should, observe and watch the red and white lights, I think it proved that they did, after they made their erroneous change to port, see the green light, and that such green light continued visible, after the North Star ported her helm, longer than it should. Seeing the green light, and, as one of the witnesses says, seeing the green light follow them, was calculated to mislead. It was calculated to encourage them in the idea that their best chance of avoiding collision was by going further to the eastward. While I do not regard this as a sufficient excuse to the Ella Warley, it was a clear fault of the North Star. contributing to the result. If the screen had been of proper length, it is doubtful whether the green light would have been seen at all on the Ella Warley, and, after the North Star ported, it would have been shut out from view. The duty to carry lights properly screened is as peremptory as the rule to port the helm when vessels are meeting, or any other rule. It may have been a fault, it was a fault, in the Ella Warley, not to observe the latter; but it was also a fault in the North Star not to observe the former. Both faults contributed to the collision, and, in my judgment neither fault, without the cooperation of the other, would have produced it. If I were at liberty to apportion the fault according to my estimate of the degrees of culpability, I might conclude that the largest blame rested on the Ella Warley. Indeed, I think that quite clear; but the court cannot enter into such an estimate of proportions. The general rule of contribution must be applied.

My conclusions hereupon are: The vessels were approaching each other on a line or lines so nearly coincident. that the rule requiring each to port the helm and pass to the right, if any change was made, operated upon them. Before the Ella Warley had made the proper observation upon the lights of the North Star, and yet acting upon the idea that there was danger of collision if she held her course, she starboarded, in violation of the rule. The North Star ported at the proper time, and was justified in doing so. The Ella Warley was in fault in not seeing the lights on the North Star, red and white, which were visible, and observation of which would have enabled her to correct her first error. The Ella Warley was grossly in fault in not slowing, stopping and backing when the collision was imminent, and so averting or diminishing the injury. The North Star did what was proper in this respect. and all that it was her duty to do. The North Star was in gross fault in not having her lights properly screened. This kept her green light in view when it ought not to have been visible. It contributed to mislead the Ella Warley, and tended to confirm her in her error and prevent the discovery by her that she was wrong. If the Ella Warley had not starboarded, in violation of the rule, the collision would not have occurred. If the lights of the North Star had been properly screened, the error of the Ella Warley would have been discovered and the accident would not have happened.

Under the influence of mutual fault, loss has been suffered. which, under the law governing courts of admiralty, must be shared by both parties. Let a decree to this effect be entered.

[Appeals were then taken by both parties to the supreme court. where the decree of this court was affirmed. 106 U. S. 17. 1 Sup. Ct. 41. For a hearing to determine the value of the Ella Warley, see Case No. 10.332. For a final apportionment of the damages, see Id. 16.839.]